[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs seek a mandatory injunction ordering the defendants to remove an addition to their dwelling at 97 Sound View Drive, Stamford, on the grounds that the addition violates CT Page 3469 a certain restrictive covenant and further seek to enjoin the defendants from building beyond a deeded setback line of thirty feet in the future.
The addition, described as a veranda in the building permit application, consists of enclosed space approximately 30 by 20 feet by 20 feet in height containing rooms described as "foyer," "toilet" and "enclosed porch." (Pl. Exs. VV and WW).
This lot was conveyed to the defendants by a deed from Jonathan Burr dated December 30, 1986. (Pl. Ex. A). The parcel is described as lot No. 6, on a certain map entitled, "Map of `Seaview Estates' in Stamford, Connecticut, Showing Revision of Lots No. 5 and 6 Map No 8386 S.L.R. Prepared for G. and S. Builders, Inc.," Certified Substantially Correct Rocco V. D. Andrea, Surveyor, Riverside, Connecticut, February 29, 1968, which map is on file in the Office of the Town Clerk of the said City of Stamford by the Map No. 8710.
The premises were conveyed subject to a number of restrictive covenants and easements among which were "restrictive covenants and agreements contained in a deed from Walter E. Brown et al to Clara O. Brown, dated May 25, 1925, and recorded in Volume 299 at Page 143 of the Stamford Land Records."
In 1925, Walter E. Brown and his brother, Charles Herbert Brown, owned a rectangular tract of land containing 13.1 acres in the southeast side of Stamford. The tract was bounded on the north by highway, Sound View Avenue and on the south by the waters of Long Island Sound. The tract was set out on Map 999/999A on file in the Stamford Land Records. (Pl. Ex. D).The map showed a "Private Right of Way" approximately 40 feet wide running through the center of the tract from Sound View Avenue on the north for a distance of some 1440 feet to the beach bordering Long Island Sound.
By the deed dated May 25, 1925, the brothers conveyed to Clara Brown a lot on the northeast portion of the tract. The lot was bounded by Sound View Avenue and the "Private Right of Way."
The deed reserved to each property owner and to anyone who may thereafter be granted, a right of way, in common with others, over the "Private Right of Way" as laid out on the map in the same manner and to the same extent and under the same limitations as if it were a public highway, together also with an easement in common with others, to whom the same may be granted, over and upon the beach which is described in the deed.
In the deed, the parties imposed a number of restrictions, CT Page 3470 covenants and easements to run with the land and be binding on the land of the grantee and all the remaining land of the grantors as shown on the map. Among the restrictions were that the premises shall be used for residential purposes only; that no dwelling shall be erected on any subdivision of the land having a frontage of less than 100 feet on any street or avenue that such subdivision touches; and, that not more than one dwelling house, which shall be a single front detached dwelling, shall be erected on any subdivision having such frontage.
The restriction in issue in this suit is: "that no part of any such house shall be erected within thirty five (35) feet of the line of any part of said premises facing on said `Private Right of Way' nor within sixty five (65) feet of the line of any part of said premises facing on Sound View Avenue, except, however, cornices, verandas, piazzas, and porches, and steps to the same." (Pl. Ex. B).
Charles Brown later acquired all of his brother's interest in the remaining tract and in 1946, conveyed the Northwest corner of tract to James and Jane Okie subject to the same restrictions. (Pl. Ex. KK). In May, 1962, the executor of the estate of Charles Brown conveyed the remainder of the tract to Hearthstone Park, Inc. subject to the restrictions contained in the earlier deed to Clara O. Brown. (Pl. Ex. CC).
Testimony, deeds and maps in exhibit indicate that Hearthstone Park, Inc. created a subdivision of 12 lots uniform in size and shape bordering on the "Private Right of Way" and two larger lots on the southerly side of the tract, Plots A and B, each of which contained a large tide-water lagoon and each of which bordered on Long Island Sound. (Pl. Exs. H and K).
Beginning on 1953, Hearthstone Park began transferring title by separate deeds, each subject to the restriction, to various lots within the tract. After Lots 1 through 12 were sold and developed, a major portion of the "Private Right of Way" — that which was bordered by the 12 lots — was dedicated to and accepted by the city as a city street: Sound View Drive. Each of the original subdivision lot owners retained a proportionate fee interest in the remaining portion of the "Private Right of Way" and in the beach at the end of the right of way subject to the right of way of others.
Thereafter, Plot A, which adjoins the opposite side of the "Private Right of Way" from the defendant's lot was conveyed to Rossmore and Lorene Lyon and then, by them, to Elizabeth Werner, subject to the Brown deed restrictions. That plot has been improved with a single family home and has not further been subdivided. (Pl. Exs. HH and II). CT Page 3471
Plot B was conveyed through several intervening owners, by deeds subject to the Brown deed restriction and to certain other restrictions contained in a declaration of restrictions by Hearthstone Park, Inc., to John Sotire. (Pl. Ex. J). Sotire, having filled in the lagoon, subdivided Plot B into six building lots, 1 lots, Lots 1 through 6 arranged on a paved extension of Sound View Drive. Each of the lots has 100 feet of frontage on the extension of Sound View Drive, as required by the Brown deed. The subdivision is shown on Map 8357 of the Stamford Land Records. (Pl. Ex. R). Deeds to the six lots were conveyed to the purchasers subject, inter alia, to the restrictions contained in the Brown deed. As developed, each of the lots and the dwellings thereon conformed to the Brown deed restrictions.
Lot No. 1 as shown on the map, is bounded on the west in part, by a portion of Sound View Drive that was part of the original "Private Right of Way" and on the southwest in part, by Sound View Drive Extension. It is owned by the plaintiff, Barbara Desilets. Abutting that lot on the east is Lot No. 2, owned by the plaintiffs, Victoria and Bernard Dombroski. The defendants own Lot No. 6 as shown on that map, and as modified by a revision map 8386 (Pl. Ex. C). This lot fronts on Sound View Drive Extension and is bounded on the west by the remaining portion of the "Private Right of Way" and on the south by the beach.
When the defendants acquired the property it was improved by a single family dwelling with a two story deck located on the side closest to the "Private Right of Way." The deck extended in part into the 35 foot restricted area.
It appears that the defendants initially submitted plans to the building department for a construction of a two-car garage with a master bedroom suite above the garage. The proposed addition would have extended substantially into the thirty five foot setback. The plaintiffs secured a temporary injunction on the claim of a violation of the restrictive covenants. The injunction was vacated after the defendants abandoned their planned construction and after a stipulation was agreed upon that the construction of a porch was permissible.
The defendants then submitted an application for the construction of a veranda or porch and supplied an architect's plan for the present two story cathedral ceiling addition, which the defendants maintain is a porch. The plaintiffs maintain that the structure is but the addition of a huge living space to the dwelling. The addition projects some twenty five feet into the thirty five foot restricted area facing the "Private Right of CT Page 3472 Way." Testimony indicated that the structure appears substantially similar in design, materials and construction to the previously proposed project.
The defendants began erection of the structure before the plaintiffs applied for a temporary injunction. During the pendency of the suit, the defendants continued and have substantially completed construction, so the plaintiffs now seek a mandatory injunction
 I.
The evidence indicates that each lot in the tract, as it was developed from the time the original restrictive covenants were established by the Browns, is improved with a single family house, consistent with the Brown restrictions. The improvements on each lot, with the exception of the addition constructed by the defendants, complies with the setback restrictions established by the Brown deed. The deeds to the plaintiffs and the defendants refer to the restriction and the chain of deeds back to the Brown conveyance all incorporate the restriction.
The court is satisfied that the restriction has been imposed as part of a general plan of development by the common grantors, the brothers Brown and the executor of the estate of Charles Brown; that there is substantial uniformity in the restrictions imposed in the individual deeds; that the restriction has been imposed on all or substantially all the lots; and, that the tract has been developed according to a comprehensive plan. Moreover, an examination of the Brown Deed (Pl. Ex. A), with its references to subdivisions, restrictions as to setbacks, frontage, type and use of buildings, and rights of lot owners to use the "Private Right of Way" and the beach, clearly indicates an intent to divest themselves of ownership. Although Charles Brown died before such divestiture, the executor's deed to Hearthstone Park, Hearthstone Park's subdivision and sale of lots, all subject to the restriction, and the subsequent subdivision by Sotire of "Seaview Estates," also containing uniformly that restriction, demonstrates an unambiguous intent of a scheme for restrictions that would benefit all lot owners by the imposition of the restrictions on all lot owners.
Under such circumstances, the plaintiffs have standing to enforce the restriction.
"[Under] a general development scheme where the owner divides the land into building lots to be sold by deeds containing substantially uniform restrictions, any grantee may CT Page 3473 enforce the restrictions against any other grantee. Marion Road Assn. v. Harlow, 1 Conn. App. 329, 333, 472 A.2d 785 (1984), quoting Pulver v. Mascola, 155 Conn. 644, 650, 237 A.2d 97
(1967).
 II.
The defendants maintain that since restrictive covenants, being in derogation of the common law right to use land for all lawful purposes, are to be narrowly construed and are not to be extended by implication, if the language is of doubtful meaning, it shall be construed against rather than in favor of the covenant. Bassett v. Pepe, 94 Conn. 631, 637, 110 A. 56.
Defendants maintain that a thorough review of the deed, the covenants, and the circumstances surrounding the enactment of the restrictive covenant at issue, indicates it clearly expresses the intent of the parties that each property which is subdivided should be set back thirty five feet from the only known roadway at that time being the private Right of Way. That is, any house facing the Right of Way could not be built closer than thirty five feet from the Right of Way. Thus, the restriction is meant to be a setback from the Right of Way to the front of the house facing on that Right of Way.
Defendants cite Rhinehart v. Leitch, 107 Conn. 400,140 A. 763 (1928) in support of their contention that such restriction must refer to a setback from a street on which the house on the lot fronts, since the defendant's house fronts on the Sound View Drive extension and not on the Private Right of Way, the restriction is not applicable to the defendant's lot as well as to any of the lots which front on the Sound View Drive extension.
In Rhinehart the restriction read, "no part of the foundation of any building shall be within twenty-five feet of the street line on which said lot fronts." The defendant had purchased a lot on the corner of Bedford Street and Third Street. The court stated that as applied to a building, the word "front" commonly refers to the side of it in which the main entrance is located and, as applied to a vacant corner lot, to that side which has the shorter street line, because of the general usage of facing houses in that direction; but that is not a term of art and its meaning, in each case, depends upon the context in which it is used and the surrounding circumstances. The court went on to say that: "In the instant case it seems to us that anyone purchasing lots at the street corners in the tract, as the defendant has done, might reasonably have understood the restriction in question to apply solely to the narrower width abutting upon a street." Id, 405. CT Page 3474
The Rhinehart rationale is not applicable here. In Rhinehart the restriction was general as to "street line," without indicating a particular street. Here, the "Private Right of Way" is explicitly designated. In the Brown deed there is a provision "that no dwelling house shall be erected upon any sub-division of the land designated upon said map having a frontage of less than one hundred (100) feet on any street or avenue that such subdivision touches; . . ." (emphasis supplied), while the thirty five foot setback refers specifically to the "Private Right of Way" rather than "any street or avenue." The "Private Right of Way" under the deed was also to be the access way for the enjoyment of the easement to and upon the beach at the end of the "Private Right of Way" and there was a restriction that "no boathouse or other outbuilding shall be erected . . . within seventy five (75) feet of any such line of said `Private Right of Way' . . ." Thus, it is equally apparent that the "Private Right of Way" was intended as a passage to the beach and the waters of the Sound with an uncluttered vista.
The defendants contend that: "It is clear that anyone purchasing Lot #6, in reviewing the restriction, might reasonably have understood the restriction in question to apply solely to a house facing the Private Right of Way."
However, the evidence also indicates that in 1969, when construction of a house on Lot No. 6 was begun with the placement of a foundation in violation of the thirty five foot setback restriction from the "Private Right of Way," that construction was halted upon the complaint of neighbors about the violation. Thereafter, the defendants' predecessor in title entered into a land swap with the owner of the adjoining Lot No. 5 in order to gain enough width for the lot to permit compliance with the setback from the "Private Right of Way". The predecessor then moved the location of the foundation in order to comply with the requirement of setback from the "Private Right of Way" in constructing the house.
 III.
The defendants argue that the restriction at issue is not valid and enforceable. The defendants contend that the restriction does not benefit anyone and, therefore, is void and unenforceable. The defendants cite Colonial Trust Co. v. Brown,105 Conn. 261, 135 A. 555 (1927) and Hartford Electric Light Co. v. Levitz, 173 Conn. 15, 23, 376 A.2d 381 (1977). Those cases are not in point. One involves the enforcement of a restriction on the lease of buildings and their height in a highly commercial zone; the other involves an easement for power CT Page 3475 lines. Moreover, the restriction benefits the plaintiffs and others in the tract by maintaining a uniform development, an access way to the beach and the waters of the sound, with a way to and a vista of that beach and those waters not impinged upon by structures.
The defendants contend that there is no uniformity as to this restriction; that, in fact, only the defendants are burdened by this restriction and they cannot enforce the restriction against anyone else. The claim is that the defendants' property has the burden of this restriction but not the benefit.
It is ingenious to argue that since the defendants have no opportunity to enforce the restriction because all the others burdened by the restriction are in compliance, the restriction is invalid as to them and they may violate it.
The defendants cannot presently enforce the restriction because the evidence shows that any other lot that might be affected by the restriction is in compliance with it. Plaintiff Desilets' lot, Lot No. 1, has frontage on that portion of Sound View Drive which was the "Private Right of Way"and is in compliance. The twelve lots along Sound View Drive are in apparent compliance. However, Plot A is subject to the restriction and if it were to be subdivided, no building could be erected within thirty five feet of the "Right of Way." A restriction which the defendants as benefitted [benefited] owners might enforce.
 IV.
The central issue in this case is whether the addition comes within the exceptions to the restriction permitting cornices, verandas, piazza, and porches."
The plaintiffs claim that the defendants first submitted an application to the Stamford Building Department for a permit to build a two-story attached garage with a master bedroom above. When that proposal was blocked by a temporary injunction on the claim that it violated the restrictive covenant, the defendants then submitted plans for a "veranda." But the plans actually submitted, in support of that application, described the proposed work as a completely enclosed addition containing rooms labelled "Toilet," "Foyer" and "Enclosed Porch."
The plaintiffs claim and the testimony and exhibits support the claim that what has been built in spite of plaintiffs' pending action is a completely enclosed addition, with windows smaller than on the approved plans, including a powder room CT Page 3476 space with a separate utility closet, containing a hot water heating furnace and plumbing connections for a washing machine and dryer. One of the addition's three exterior walls — the one facing the "Private Right of Way" from a distance of ten feet — has no windows in its twenty foot length.
The addition has the same interior and exterior materials and finishes as the rest of the house, has hot water baseboard heat, a sleeve in one wall for the installation of an air conditioner, R-30 insulation in the cathedral ceiling and R-19 insulation in its walls. There is no separate means of ingress or egress to the outside from the addition, other than the foyer which provides access on one side to the "enclosed porch" and one the other side to the rest of the dwelling. There is no portion of the "enclosed porch" that is open to the weather or that provides for outdoor seating.
The plaintiffs claim that the meaning of the terms used in he Brown deed restriction should be determined in the commonly understood meaning of those words in 1925. They offered the definitions from Webster's New International Dictionary of the English Language, 2d. Ed., published in 1944 as a source:
"Piazza . . .
1. . . . . An open square in an Italian (or sometimes other European) town, esp. the largest, or an unusually large, one as where a smaller one is called campo, piazzetta, or the like; . . . 3. By extension, an arcaded and roofed gallery, such as often surrounded a true piazza; also, a portico or single colonnade before a building; hence, esp. U.S. Can., a veranda."
"Porch . . .
1. Arch. A covered entrance to a building, rarely an interior vestibule, more commonly a structure, enclosed in part, projecting out from the main wall and having a separate roof. It may be large enough to serve as a covered walk. See also CARRIAGE PORCH, LOGGIA. 2. A portico, covered walk, colonnade. Obs . . . 3. A transept or side chapel. N. of England. 4. A veranda, as a screened porch. Chiefly U.S. 5. An entrance; vestibule; a place of waiting before entering; a passage . . ."
"Veranda . . .
Arch. An open gallery or portico, usually roofed, attached to the exterior of a building, used for sitting out of doors; — in the United States often called a porch or a piazza." CT Page 3477
There was testimony from a Mrs. Renee Kahn, expertly conversant with structures of the period, that the term "porch" then referred to a transitional element between the house and the outdoors, usually marking an entry of a building, usually of post and beam construction and open to the weather on two or more sides. The terms porch, piazza and veranda were in her opinion synonymous. She testified that the addition to the defendant's residence was not a porch in her opinion.
The defendants, on the other hand, claimed that there is no restriction in the Brown deed as to what type of house could be constructed in the tract. If the meaning of porch were limited to the term as used in 1925, rather than the modern concept, then the court would be expanding the effect of the restriction and limiting the type of house that could be erected to the style of homes in the 1920's.
On behalf of the defendants, their licensed architect, Mr. Khan, who prepared the drawings and design of the addition, testified that he had been commissioned to design a porch for a certain area, without any explicit direction from the defendants as to the design. He designed the structure involved in this suit as a porch. He stated that modern porches are often designed as enclosed structures and that this structure is a modern porch.
The defendants also note that one of the plaintiffs' witnesses, Mr. Dwyer, an architect, stated that the structure was not a porch because he had never seen such a structure as a porch in his experience. However, he also allowed that porches could be heated, could have cathedral ceilings, and could be enclosed by windows that were not removable. These are elements which the plaintiffs claim demonstrate that the structure is not a porch.
The issue ultimately must be resolved by this court on a determination of whether the addition is, no matter what the nomenclature, an extension of the house so as to protrude the house itself into the restricted zone or is a porch or veranda permitted as an exception to the restriction.
The court has examined the drawings and the many photographs showing the exterior of the structure as it was being constructed and as it was finished, as well as its appearance with and relationship to the original dwelling.
The addition is indistinguishable from the dwelling and appears to be an integral part of the house. The only way one, not an expert, might perceive this to be a porch is to be told CT Page 3478 it is a porch. The structure is designed for year round use, is completely enclosed with one exterior wall without any windows, is furnished with a toilet and utility room, and is of the same, design, materials, construction and finish as the rest of the house. To designate this as a porch would be to allow any substantial enclosed addition of living space to a house to be deemed a porch because it has been called a porch. This structure is in violation of the restrictive covenant.
 V.
Finally, should an injunction be issued against the defendants?
The plaintiffs claim and the defendants acknowledge that a restrictive covenant may be enforced by an injunction without a showing that a violation of a covenant will cause harm to the plaintiff. Hartford Electric Light Co. v. Levitz, 173 Conn. 15,21, 376 A.2d 399 (1977).
The defendants assert, however, that one who has an enforceable right is not necessarily entitled to an injunction particularly when injunctive relief itself will be incompatible with the equities of the case. More v. Serafin,163 Conn. 1, 8, 301 A.2d 238 (1972).
The defendants claim that the plaintiffs have violated the covenants themselves and come to court without clean hands. This is based on the testimony of the defendant Voll, which the court credits, that he has asked persons responsible for maintaining the Right of way to open up the right of way, pave it, and remove the fence blocking it off from the rest of Sound View Drive so that he can have access to his property. He claims he was told that he had no right to use the Right of Way and that he had no right to use the beach. But, the covenants and restrictions allow each and every property owner to use the Right of Way for the purpose of ingress and egress. Therefore, the plaintiffs, with other property owners in the tract, have breached the restrictive covenants and easements by fencing off the Right of Way and by failing to keep the Right of Way open and passable as a street. "One cannot obtain relief in equity against a violation of the restrictive agreement entered into in pursuance of a general plan, if he himself was guilty of a substantial breach of the same restriction." Maganini v. Hodgson, 138 Conn. 188, 195, 82 A.2d 801 (1951).
However, there was no evidence that any of the plaintiffs were involved in such actions or restrictions of the defendants' rights to utilize the Right of Way or the beach. Absent such a showing, the defendant's claim is not tenable. Moreover, in CT Page 3479 Maganini, the same quotation asserted by the defendants goes on: "[Nor] will his own violation of one restriction estop him to compel the observance of another restriction beneficial to his property."
In this case, the defendant Voll testified that he was aware of the restriction concerning the setback when he acquired the property. Moreover, the defendant's should have been aware and on notice that the plaintiffs intended to enforce the restrictive covenant when they secured a temporary injunction to prevent the construction of the original project on the basis of that restriction. Finally, the defendants elected to complete the construction of the addition despite the pendency of this action.
As the plaintiffs have cited:
"The [defendant] purchased the land with full knowledge that the . . . tract was subject to the restrictions; he got everything he bargained for, and presumably took the restrictions into consideration when he agreed on the price he paid: `He was under no compulsion to make the purchase, and if ownership of this . . . ground seemed sufficiently desirable to induce him to agree to the terms demanded and to accept a deed containing the restrictions, it is neither unjust nor inequitable that he be required to observe its limitations.' Beck v. Heckman, supra, 140 Iowa at page 355, 118 N.W. at page 511, 132 Am St. Rep. 277." Harris v. Pease, 135 Conn. 535,541-42, 66 A.2d 590 (1949).
 VI.
The court therefore is of the opinion that a mandatory injunction should issue directing the defendants to either remove the addition in so far as it intrudes beyond the thirty-five foot setback or to modify the addition to conform to the restrictive covenant.
Pending the issuance of the final decree, the court enters the following orders:
1. A mandatory injunction may issue directing the defendants to remove so much of the addition to the building as extends into the restricted thirty five foot area, but this order is temporarily stayed upon the following conditions;
2. The defendants are enjoined and restrained from using, adding to or completing any portion of the addition without further order of this court; CT Page 3480
3. The court directs the parties to appear before it within two weeks from receipt of this memorandum, or as soon thereafter as may reasonably be agreed by the parties, to assist in the formulation of an appropriate decree;
4. If the defendants indicate an election not to appear, the court will forthwith issue an injunction as above indicated and counsel for the plaintiffs is directed to prepare a form of injunction to that end.
NIGRO, J.